# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4247 | **DATE** | 12/30/2002 |
| **CASE TITLE** | Jake Flowers, Inc. vs. Herb Kaiser & Linda Kaiser | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Memorandum Opinion and Order entered. For the reasons set forth in the decision attached, Plaintiff's Motion for Summary Judgment [#27] is **granted in part and denied in part**; Defendants' Motion for Summary Judgment [#28] is **granted in part and denied in part**.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | DEC 3 1 2002 date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 12/30/2002 date mailed notice | |
| FT/ *secy* courtroom deputy's initials | | 02 DEC 30 PM 4:07 Date/time received in central Clerk's Office | FT mailing deputy initials | |



JAKE FLOWERS, INC.,                    )
                                       )
                    Plaintiff,         )     No. 01 C 4247
                                       )
          v.                           )
                                       )     Magistrate Judge
HERB KAISER and LINDA KAISER,          )     Arlander Keys
                                       )
                    Defendants.        )


## MEMORANDUM OPINION AND ORDER

Plaintiff, Jake Flowers, Inc., moves this Court for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendants, Herb and Linda Kaiser, have filed a cross motion for summary judgment. For the reasons set forth below, the Court grants Plaintiff's motion on Defendants' Counter-Complaint Count II and grants Defendants' motion, on Counts V and VII of the Complaint and Count I of Defendants' Counter-Complaint. Summary judgment is denied both parties on Counts I through IV, and Count VI of the Complaint.

### PROCEDURAL HISTORY

On June 6, 2001, Plaintiff, Jake Flowers, Inc. ("Jake's"), filed suit against Defendants, Herb and Linda Kaiser, for injunctive relief. The seven count complaint alleged that Defendants' unauthorized use of Jake's trademarks constitutes (1) trademark infringement, in violation of the Lanham Act, 15 U.S.C.

1

§ 1114 (1997); (2) unfair competition, violating Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a) (1997); (3) common law trademark infringement; (4) deceptive trade practice, violating Section 2 of the Illinois Uniform Deceptive Trade Practices Act, 815 ILL. COMP. STAT. 510/2 (1999); (5) dilution, causing injury to Jake's business reputation, violating the Illinois Anti-Dilution Act, 765 ILL. COMP. STAT. 1035/15 (1994); (6) common law unjust enrichment; and (7) violation of the non-compete provisions in Defendants' 1976 License Agreement. On June 27, 2001, this matter was referred to the Court for pre-trial motions and discovery.

On July 17, 2001, Defendants filed a verified answer and Counter-Complaint, alleging that Jake's breached its 1976 License Agreement and violated the Illinois Franchise Disclosure Act, 815 ILL. COMP. STAT. 705/1-44 (1999).[1]

On Nov. 16, 2001, the Court, *sua sponte*, initiated a settlement conference, but the parties were unable to reach an accord. Following completion of discovery, the parties consented to the jurisdiction of this Court.[2] On May 3, 2002, both parties

---

[1] The Counter-Complaint (Counts III and IV) also alleged that Jake's breached the 1976 License Agreement with respect to product supplies and violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/1-12 (1999). Defendants subsequently agreed to dismiss Counts III and IV. (Defs.' 56.1 ¶ 6.)

[2] The parties consented to proceed before a magistrate judge on Feb. 12, 2002, and Judge Manning reassigned the case to this Court on Feb. 15, 2002.

filed Motions for Summary Judgment, which are the subject of this Opinion.

## FACTUAL BACKGROUND

Jake's is an Illinois corporation that sells pizza through authorized franchisees. (Pl.'s State. of Mat. Uncontested Facts ¶¶ 1, 3.) Jake's owns four federal trademarks, which were registered in 1994 and 1995. (V. Answer ¶ 7.) Defendants signed a license agreement with Jake's International, Inc.[3] on December 8, 1976 ("1976 License Agreement"). (Pl.'s 56.1 Resp., Ex. B.)

The 1976 License Agreement provided for renewal at five-year intervals, but Jake's alleges that it did not renew automatically for an indefinite period because it contained termination provisions. (Id. ¶ 7.) Defendants maintain that the License Agreement renewed according to its terms on December 8, 1996 for an additional five years and that the agreement was in full force as of December 5, 2000. (Defs.' 56.1 Opp. ¶ 2.)

The present dispute began when Jake's requested that Defendants execute a newly proposed franchise agreement[4] ("New Agreement") on or about September 5, 2000, to replace the 1976 License Agreement. (Pl.'s 56.1 Resp. ¶ 9.) Jake's claims that the terms of the New Agreement and the 1976 License Agreement are

---

[3] Plaintiff, Jake Flowers, Inc., acquired the assets, including the trademark rights and goodwill associated therewith, of Jake's International, Inc. on Dec. 4, 1997 pursuant to an order of the United States Bankruptcy Court. (Compl., Ex. B.)
[4] See Pl.'s 56.1 Resp., Ex. F.

3

not materially different. (*Id.* ¶ 12.) Additionally, Jake's believes that the addendum attached to the New Agreement made the economic terms of both agreements the same. (*Id.*)

However, Jake's admits that the New Agreement differed from the 1976 License Agreement in that it: (1) provided for Jake's approval of the terms of any lease or sub-lease; (2) provided for a service charge of 1.5% per month for late payments; (3) allowed Jake's an advertising fund of up to 2% of Defendants' gross sales (although Jake's orally indicated he would not collect the fee); and (4) constituted the entire agreement of the parties with no other oral or written understandings. (*Id.* ¶¶ 15, 20-22.) Defendants refused to sign the New Agreement, contending that the 1976 License Agreement was still in effect. (*Id.* ¶ 23.)

The parties met on October 9, 2000, wherein John Flowers, the president of Jake's, admitted that he asked Defendant Ms. Kaiser to sign the New Agreement. (Pl.'s 56.1 Resp. Opp. ¶ 43.) When Ms. Kaiser informed Mr. Flowers that it was unlikely that she and her husband would agree to sign the New Agreement, Mr. Flowers allegedly threatened to terminate Defendants' franchise. (*Id.* ¶ 42.) Mr. Flowers denies making such a threat.

On October 16, 2000, Mr. Flowers sent a letter to Defendants reiterating that he would like to renew the 1976 License Agreement. (Pl.'s 56.1 Resp., **Ex.** I.) Jake's admits that the letter indicated its belief that Defendants would have to sign the New Agreement, because Section 14.C of their 1976 License

4

Agreement empowered Jake's to compel compliance. (Pl.'s 56.1 Resp. ¶ 24.) However, Mr. Flowers acknowledged in his deposition that Section 14.C is not actually a part of the 1976 License Agreement. (*Id.* ¶ 25.)

Defendants refused to execute the New Agreement. In response, Jake's counsel issued a letter to Defendants on Dec. 5, 2000, demanding that they cease and desist using Jake's trademarks, and that they cancel their current telephone number, as Jake's claims that their telephone number was associated with Jake's trademarks in a telephone book advertisement. (*Id.* ¶¶ 8, 26, Ex. A, D.) The letter admonished Defendants to discontinue representing themselves as a Jake's franchise, and to discontinue their use of Jake's trademarks, proprietary information, and trade secrets. (*Id.*)

Defendants made, at the very least, nominal efforts to comply with the demands set forth in Jake's Dec. 5, 2000 letter. Jake's acknowledges that Defendants changed their pizza ingredients in December 2000 and de-identified with Jake's by removing identifying signs, and returning pamphlets, recipes, boxes, and shirts that contained the "Jake's" trademarks. (*Id.* ¶¶ 27-28, 30-35.) Jake's contends, however, that Defendants continued using the telephone number associated with Jake's trademarks. (*Id.* ¶¶ 28-29.)

Defendants admit that they did not change the telephone number in December 2000. (Defs.' 56.1 ¶ 29.) Defendants assert

that they had used this telephone number since 1973. Conversely, the telephone book advertisement, which referenced Jake's, and the telephone number, had been submitted in August 2000.  (*Id.* ¶¶ 29, 46.)  Defendants claim that no changes were allowed after the August advertisement submission date, and that the Ameritech Yellow Pages telephone books were printed before December 5, 2000.  (Defs.' 56.1 Opp. ¶¶ 40-41.) As such, Defendant's claim that they were powerless to change the advertisement.

Another telephone book advertisement, listing Defendants' telephone number as a Jake's franchise, appeared in the May 2002/2003 "Planet Pages," a telephone book published by McLeodUSA.  (Defs.' Resp. to Pl.'s State. ¶ 26.)   Defendants maintain that they did not solicit this advertisement; the affidavit supplied by Nancy Rosendahl of McLeodUSA corroborates that McLeodUSA was responsible for the ad and not Defendants. (Defs.' 56.1 Opp. ¶ 51)  Ms. Rosendahl states that, "the listing was complimentary and was not solicited by the 150 South Pizza Pie Company, Herb Kaiser or Linda Kaiser."  (Rosendahl Aff. ¶ 4.)

Furthermore, Defendants assert that, on September 10, 2001, Jake's web page still listed Defendants' Palatine restaurant location and telephone number as part of the Jake's franchise system and was still listed on Jake's web page as of March 19, 2002.  (*Id.* ¶ 52.)

Jake's concedes that Defendants renewed and paid for their Ameritech Yellow Page advertisement,  which  showed  the  Jake's

trademarks, in August 2000 -- at least three months before Jake's demanded that Defendants de-identify their restaurant from the Jake's system -- but asserts that Defendants could have, nevertheless, stopped using the telephone number. (Pl.'s 56.1 Resp. ¶ 46.) Jake's waffles on whether Defendants could have later changed the listing; at one point, Jake's concedes that Defendants were powerless to do so, but later, Jake's disputes Ms. Kaiser's assertion that no changes could be made after Sept. 2000. (Pl.'s 56.1 Resp. Opp. ¶ 40.) Jake's claims the inability to change the advertisement is without foundation and only represents Ms. Kaiser's understanding. (Id. ¶¶ 40-41.)

Jakes further alleges that Defendants were representing themselves as a Jake's franchise after December, 2000. On two occasions in approximately January, 2001, Mr. Flowers' secretary, Jackie Sabella, called Defendants' telephone number and inquired as to whether their restaurant was a Jake's restaurant. Ms. Sabella claims that, on both occasions, she was told that Defendant's restaurant was "the same thing" as a Jake's restaurant." (Id.) However, Ms. Sabella admits that the person initially answering the telephone identified the restaurant as "150 North."[5] (Pl.'s 56.1 Resp. Opp. ¶ 36, Ex. G, Sabella Dep. at 95-97)

---

[5] After de-identifying from Jake's, Defendants re-named the restaurant 150 South Pizza Pie Company and maintained its Palatine, Illinois location. (Defs.' Resp. to Pl.'s State. ¶¶ 8, 14-15.)

Ms. Kaiser testified that, following the December 2000 "deidentification,"ten percent of their potential customers hung up after being advised that their restaurant was no longer a Jake's franchise[6]. In August 2001, when the new Ameritech Yellow Pages was issued, Defendants officially changed their restaurant's telephone number, a number the restaurant had used since 1973[7]. (Defs.' 56.1 Opp. ¶ 20.)

Defendants claim that they incurred damages as a result of Jake's demand that they cease using Jake's trademarks in December 2000. (Defs.' 56.2 Opp. ¶¶ 18-19, 45-47.) Damages consisted of $679.00 for reprinting of new menus, (*Id.* ¶¶ 45-47.) and a $70,000 loss in sales revenue. (Defs.' Resp. to Pl.'s State. ¶24.) Ms. Kaiser concedes that some of the loss in sales revenue could have been attributable to a general decline in restaurant sales after September 11, 2001. (*Id.*)

## STANDARD OF REVIEW

Summary judgment is appropriate when the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists when

---

[6]

Jake's disputes this, stating that Defendants used a referral number and that Ms. Kaiser's comment with regard to ten percent of the callers hanging up is without foundation, since she did not always answer the telephone. (Pl.'s 56.1 Resp. Opp. ¶ 38.)

[7]

Jake's claims that the former telephone number, when dialed, referred the caller to Defendants' new telephone number. (Sabella Dep. at 97.)

the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590 (1992) *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Initially, the moving party bears the burden of showing that the record contains no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Governing substantive law identifies material facts, and only disputes over facts that might affect the outcome will properly preclude summary judgment. *Anderson*, 477 U.S. at 248.

When the moving party has carried its burden, the non-moving party must present more than a "metaphysical doubt as to the material facts" to survive summary judgment. *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Additionally, presenting only a "scintilla of evidence" or "mere conclusory allegations" will not defeat summary judgment. *Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 599, 602 (7th Cir. 1999).

At the summary judgment stage, courts do not make credibility determinations or weigh evidence. *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001). The court must view the facts in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. Additionally, pursuant to Northern District of Illinois Local Rule 56.1, the parties must support all disputed facts with specific references to the parts of the

record, affidavits, and other supporting material relative to the facts in dispute. The Seventh Circuit has directed that the court need not "scour the record in search of factual or legal support" to locate relevant information supporting the claims. *Bennington v. Caterpillar*, 275 F.3d 654, 661 (7th Cir. 2001).

When reviewing cross-motions for summary judgment, the Court must consider each motion independently, and draw factual inferences according. As such, the Court need not grant either party's motion. To the contrary, competing factual inferences -- ie., the Court may infer material facts in favor of a defendant when reviewing a plaintiff's motion for summary judgment, and may infer the same material facts in favor of the plaintiff when considering the defendant's motion for summary judgment -- frequently warrant denying both parties' motions.

## ANALYSIS

### I. Federal Trademark Infringement

Count I of Jake's Complaint charges Defendants with infringing Jake's trademarks under 15 U.S.C. §1114 of the Lanham Act. Before analyzing the merits of Plaintiff's Lanham Act claim, the Court addresses Defendants' argument that the claim is not valid.

In their reply brief, Defendants maintain that Plaintiff's trademark infringement claim must fail, because the 1976 License Agreement was not legally terminated prior to the alleged infringement. Defendants cite to *Servpro Indus. v. Schmidt*, in

support of their argument that franchise agreements must be legally terminated before there can be an action for trademark infringement. *See* No. 94 C 5866, 1997 WL 158316, at *11 (N.D. Ill. Mar. 31, 1997).

The Court is not persuaded. First, the Seventh Circuit has held that legal termination of a franchise agreement is not a condition precedent to an action for infringement. *Gorenstein Enter., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989) ("once a franchise has been terminated, the franchisee cannot be allowed to keep on using the trademark."). In addition, a close review of *Servpro* reveals that the district court relied upon authority from other circuits, making the holding less persuasive -- particularly to the extent that these holdings conflict with Seventh Circuit precedent. . Finally, the holding in *Servpro* should be understood only to mean that the use of the trademarks without the lawful owner's permission violates The Lanham Act. No. 94 C 5866, 1997 WL 158316, at *11 (N.D. Ill. Mar. 31, 1997).

Once a franchise is terminated, per its terms or otherwise, the franchisee has no right to continue using the marks. The franchisee may seek other remedies for damages it may suffer from a franchisor's unlawful action, but continued use of the trademarks is not such a remedy. *See The Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 282 (7th Cir. 1992). (Stating that defendant

franchisee should not have infringed trademarks, but should have sued for breach of contract).  Therefore, assuming, *arguendo,* that Defendants' conduct constituted use of Jake's trademarks without permission, Defendants cannot claim that Jake's breach of the 1976 License Agreement gave them legal impunity from trademark infringement.

Having rejected the Defendants' "lack of termination" challenge, the Court turns to the merits of Plaintiff's Lanham Act claim.  Section 1114 of the Lanham Act prohibits trademark infringement, and provides that:

> (1) Any person who shall, without the consent of the registrant--
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive. . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C.A. §1114 (1997).

A federally registered trademark is prima facie evidence of the validity of the registered trademark, and of the registrant's exclusive right to use the registered trademark in commerce:

> § 1115. Registration on principal register as evidence of exclusive right to use mark; defenses
>
> (a) Evidentiary value; Defenses
>  Any registration issued under the Act of March 3, 1881, or the Act of February 20, 1905, or of a mark registered on the principal register provided by this chapter and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark and of

the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude another person from proving any legal or equitable defense or defect, including those set forth in subsection (b) of this section, which might have been asserted if such mark had not been registered.

15 U.S.C.A. §1115 (1997).

Trademark infringement cannot be established without proving that consumers are likely to be confused about the source. *Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1361 (7th Cir. 1995). There is no impairment of the trademark's protection if the alleged infringer's conduct is not likely to confuse consumers. *Id.* The likelihood of confusion can be proven without any evidence of actual confusion, but if such evidence is available, it is entitled to substantial weight. *Int.'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1090 (7th Cir. 1988).

In the Seventh Circuit, courts evaluate the following factors to determine whether a likelihood of consumer confusion exists: (1) the similarity of the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of current use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off

its goods as those of the plaintiffs. *Ty, Inc. v. Jones Group*, 237 F.3d 891, 897 (7th Cir. 2001).

None of the factors, standing alone, is dispositive of the likelihood of confusion question. Different factors will weigh more heavily from case to case, depending on the particular facts and circumstances. *Id.* at 898. Nevertheless, the similarity of the marks, intent of the defendant, and actual confusion are considered to be the most important factors in evaluating consumer confusion. *Id.*

With regard to most of these seven factors, factual disputes exist as to whether the factor clearly favors one party or the other. Given the procedural posture of this case, therefore, these disputes prevent the Court from granting either Plaintiff's or Defendants' Motions for Summary Judgment. The Court will, nevertheless, discuss each factor in turn.

### 1. Similarity of Marks

Shortly after Defendants received the December 2000 letter from Jake's' attorney, which terminated Defendants' franchise rights, Defendants ceased using the Jake's trademarks that they had previously used on shirts, pizza boxes, menus, outdoor signage, cups, and other restaurant objects.

However, Defendants continued using a telephone number that they had been using while they operated as a Jake's franchisee. The Ameritech Yellow pages listed their restaurant as a Jake's restaurant, carried an advertisement for Defendants' establishment as a Jake's restaurant, and ran the phone number that Defendants had used for years.[8] Although the advertisement was placed with Ameritech in August or September, 2000 -- while Defendants were still an authorized franchisee under the 1976 License Agreement -- the advertisement remained in the Ameritech Yellow Pages until the following year's Yellow Pages was released in August, 2001 -- several months after the demand for deidentification, in December, 2000. A similar ad was featured in the McLeod Planet Pages, more than one year after the deidentification demand.

The essence of Jake's' argument is that the advertisements in the Ameritech Yellow Pages and the McLeod Planet Pages constituted infringement, because Defendants did not "disconnect" the telephone number shown in the ads. As such, Jake's argues, its trademarks were used without permission.

From the time that Jake's demanded deidentification through March 19, 2002, Jake's continued to advertise Defendants' restaurant and telephone number on its corporate

---

[8] Defendants admit that they did not disconnect this telephone number.

website, as an authorized franchisee. The Court cannot help but question why, if Jake's was so concerned about protecting its trademark rights, it didn't simply "mouse click erase" Defendants' identity from Jake's website?

Despite the extenuating circumstances, the Court finds that it is obvious that the trademarks shown in the telephone book advertisements identify Defendants' restaurant as a Jake's franchise. Therefore, the Court finds that the similarity of the marks factor weighs in favor of a finding of infringement.

### 2. Similarity of Products

The products sold by Jake's and Defendants are clearly similar, although the recipes and ingredients appear to differ. Admittedly, Defendants continued selling pizzas and sandwiches after being notified by Jake's to stop using all Jake's trademarks.

However, although the products are similar, Defendants' pizzas are no longer delivered in boxes sporting the Jake's logo. Drinks are not being served in cups showing the Jake's logo. And the sign in front of the store, as well as the menus, no longer identify the food products or restaurant as a Jake's franchise.

### 3. Area and Manner of Concurrent Use

In determining whether the area and manner of concurrent use is likely to cause confusion, factors

examined should include (1) the relative areas of distribution; (2) evidence of direct competition between the products; (3) whether the products are sold in the same type of store; and (4) whether the products are sold through the same channels. *Ty, Inc.*, 237 F.3d at 900.

While Defendants continue to operate their restaurant in Palatine, Illinois,[9] the relative area of distribution would have to be compared to a Jake's restaurant located in Rolling Meadows, Illinois; Jake's has no other outlet in Palatine, and the Jake's restaurant in Rolling Meadows is the closest authorized Jake's franchise. Jake's has proffered no evidence showing that Defendants' Palatine restaurant directly competes with Jake's franchise in Rolling Meadows.

The relative areas of distribution *may* overlap, but again, the record contains little evidence on this matter. Likewise, the record does not show that there was direct competition between Defendants' restaurant and the Jake's in Rolling Meadows. Notably, the Rolling Meadows franchise coexisted with Defendants' franchise in Palatine during the time that Defendants operated as a Jake's franchise, under the 1976 License Agreement. It is unlikely that Jake's, in its best business interests, would have authorized two

---

[9] Because Defendants operate the same type of restaurant, sub-factors (3) type of store and (4) distribution channel would be virtually the same.

franchises to be located in the same competitive geographic market.

However, to reach a conclusion on this factor, the Court must draw factual inferences from the statements made by the parties. In light of the fact that the Court is considering cross-motions for summary judgment, the inferences favor both of the parties, but only in their capacities as the nonmoving party.

## 4. Degree of Care Likely to be Exercised by Consumers

Generally speaking, the more a consumer has to pay for the product, the greater the degree of care he is likely to exercise in purchasing that product. *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 683 (7th Cir. 2001). Conversely, a consumer is likely to exercise less care on lower priced goods that are widely available. *Id.* Thus, a greater chance of consumer confusion exists when a consumer is purchasing a less expensive, widely available product. *Id.*

Ms. Kaiser stated that, approximately ten percent of calling customers "hung up" when notified that their restaurant was no longer a Jake's franchise. Conversely, ninety percent of the callers arguably did not seem to care whether their pizza was Jake's or some other brand or origin, because they did not hang up when notified.

Jake's disputes whether Defendants have established a sufficient foundation to support Ms. Kaiser's testimony in

this regard, because, Jake's claims, Ms. Kaiser did not always answer the phone and the statement represents her reliance on employee feedback. Once again, this issue is too close to clearly favor either party.

### 5. **Strength of Plaintiff's Marks**

The Lanham Act provides that trademarks registered on the principal federal register are prima facie evidence of ownership of the trademarks and right to exclusive use. 15 U.S.C. §1115(a) (1997). Trademark law recognizes five categories of trademarks, in ascending order of distinctiveness and strength: generic, descriptive, suggestive, arbitrary, and fanciful. *CAE, Inc.*, 267 F.3d at 684. Additionally, the Court may look to the duration of the trademark's use, promotional expenditures, and annual sales. *Id.* at 685.

The four trademarks at issue were properly registered by Jake's predecessor, Jake's Pizza International, in 1994 and 1995, and acquired by Jake's on November 25, 1997 through a bankruptcy sale. Defendants do not dispute that Jake's owns the trademarks.[10]

The marks show "Jake's Pizza" or "Jake's Pizza & Pub" in typeface alone or within an emblem or border, depending

---

[10] No evidence was put forth showing that Jake's maintained or did not maintain its trademarks. The Trademark Office requires that an affidavit be filed six years following federal registration to keep the trademarks in force on the federal register. *See* 15 USC §1058 (1997). Assuming, *arguendo,* that Jake's did so, the trademarks at the time of the Complaint were still in force.

on which trademark registration is examined. The word "pizza" alone would be a generic term, but by adding the source indicator "Jake's", the term becomes a descriptive trademark, on the lower end of the trademark spectrum of strength, as discussed in *CAE, Inc. See also Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-11 (2d Cir. 1976).[11]

Jake's presented no evidence as to the amount of money it spent on advertising its trademark, and Defendants do not discuss the strength of Jake's trademarks. No evidence was presented on Jake's annual sales. Therefore, on the evidence presented in the record, the Court cannot make a reasoned conclusion as to the strength of Jake's trademarks.

## 6. Evidence of Actual Confusion

Evidence of actual customer confusion is entitled to substantial weight if present in the facts. *Int.'l Kennel Club*, 846 F.2d at 1090. While hearsay reports originating with employees of the plaintiff are not afforded much weight as evidence, multiple unsolicited letters or telephone calls can be afforded such evidentiary weight in determining actual customer confusion. Id. at 1090-91.

---

[11] A generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species, whereas a suggestive or fanciful term (such as aspirin, cellophane, and thermos) that was strong can become generic through use. *Abercrombie*, 537 F.2d at 9-10.

Jake's acknowledged that, when Ms. Sabella made two telephone calls to Defendants' restaurant, the person answering Defendants' phone did not identify the restaurant as a "Jake's, but said, "150 North." (Sabella Dep. at 95-97) Ms. Sabella also stated that, when she said, "I thought this was Jake's" the person answering said, "it's the same thing." (*Id.*).

Whether the phrase "the same thing" was meant to be comparative in nature and or was intended as a proclamation to confuse consumers, is a question of fact. And this dispute appears to be a material issue in this case.[12] Given the procedural posture of this case, this material dispute necessitates denying both parties' Motions for Summary Judgment.

## 7. Defendants' Intent to Palm Off Its Goods As Plaintiff's Goods.

Despite Jake's' claim of good intentions, when Mr. Flowers approached Defendants in September 2000, he set in motion the beginning of the end of a 24-year business relationship. A side-by-side comparison of the 1976 License Agreement and the proposed New Agreement reveals significant differences that would have substantially altered the twenty-four year business relationship.

---

[12] The Court concedes that, whether this dispute is material to the outcome depends upon the resolution of the other factors in this likelihood of confusion analysis.

This background is important because it bears heavily on any claim that Defendants sought to intentionally "palm off" their products as Jake's products. Mr. Flowers set the timetable in motion. When the December 5, 2000 letter arrived from Jake's attorney, Defendants immediately began "de-investing" themselves of the various shirts, menus, boxes, and other restaurant tangibles containing the Jake's trademarks. Jake's admits this.

What Defendants did not de-invest was their telephone number, in use since 1973. The printing and distribution of the telephone book advertisement that contained the telephone number and Jake's trademarks, was arguably beyond their control, except for disconnecting their telephone number referenced in the ad.

Whether or not Defendants intended to use the telephone number, and thus palm off their food products as Jake's, is a question of material fact. Jake's claims that Defendants' intent is evidenced by Defendants' failure to disconnect the phone number. Whether they disconnected the phone number is irrelevant, Defendants argue, because, when answering the telephone, Defendants did not identify themselves as Jake's. However, Jake's points to at least two occasions when affiliation to Jake's was represented, at least ambiguously. These material facts are in dispute between the parties and

a conclusion on this factor cannot be reached at the summary judgment stage.

Summarizing, given the procedural posture of this case, the Court is unable to reach a conclusion on the following factors, which are determinative in a likelihood of confusion analysis: (3) Area and Manner of Concurrent Use; (4) Degree of Care Likely to be Exercised by Consumers; (5) Strength of Plaintiff's Mark; (6) Evidence of Actual Confusion; and (7) Defendants' Intent to Palm Off Its Goods as Plaintiff's. Therefore, because a likelihood of confusion cannot be determined, trademark infringement cannot be concluded. Thus, both parties' Motions for Summary Judgment are denied as to Count I of the Complaint, alleging trademark infringement.

## II. Federal Unfair Competition

Count II of Jake's Complaint alleges unfair competition, in violation of Section 43(a) of the Lanham Act. This section provides:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services,

or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act . . .

(3) In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.

15 U.S.C. § 1125(a)

Claims alleging unfair competition can be made in cases where there are no registered trademarks, but defendant's conduct nevertheless constitutes an unfair trade practice in using another party's image. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992). Plaintiff claims that Defendants unfairly copied its trade dress, which constitutes unfair competition under the Act. *Id.* at 765-66.[13] To prevail on an unfair competition claim under 15 U.S.C. § 1125(a), Plaintiff must show that: (1) its trade dress is either inherently distinctive or has acquired secondary meaning; and (2) the similarity of Defendants' trade dress causes a likelihood of confusion on the part of consumers as to the source of the products. *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999). Likelihood of confusion regarding trade dress is determined using the same seven factor criteria as applied in the analysis of trademark infringement. *Id.*

---

[13] In *Two Pesos,* the Supreme Court, also examining a claim under 15 U.S.C. § 1125(a), deemed identifying signs, the interior kitchen floor plan, the decor, the menu, the equipment used to serve food, the servers' uniforms and other features reflecting on the total image of the restaurant as comprising trade dress. *Two Pesos*, 505 U.S. at 765.

Jake's Complaint broadly cites to 15 USC § 1125(a), but does not claim an infringement of trade dress nor that its stores have acquired a secondary meaning among consumers. To show misrepresentation, misleading conduct or customer confusion as to source, one must show customer confusion using the same test as applied under the analysis of trademark infringement. *Syndicate Sales,* 192 F.3d at 636. Because Jake's did not plead additional facts materially different from those pled in the trademark infringement count, the Court concludes, once again, that the material issue of likelihood of customer confusion remains in dispute. Therefore, the Court denies summary judgment to both parties on Count II.

### III. Common Law Trade Name and Trademark Infringement

The Seventh Circuit has concluded that, "the linchpin of both common law and federal statutory trademark infringement claims is whether consumers in the relevant market confuse the alleged infringer's mark with the complainant's mark." *AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 615 (7th Cir. 1993). Because the Court cannot properly conclude that confusion exists and that, therefore, a valid trademark infringement claim exists, the Court denies both parties' Motions for Summary Judgment on Count III of the Complaint.

## IV. Violation of the Illinois Uniform Deceptive Trade Practices Act[14]

Essential to a claim under the Illinois Uniform Deceptive Trade Practices Act are well-pled allegations indicating a likelihood of confusion. *Door Systems, Inc. v. Overhead Door Systems, Inc.*, 905 F. Supp. 492, 498 (N.D. Ill. Oct. 30, 1995). Again, because a likelihood of confusion may or may not exist based on fact conclusions, the Court denies summary judgment to both parties on Count IV.

## V. Violation of the Illinois Anti-Dilution Act[15]

The Illinois Courts have consistently held that the protections of the Illinois Anti-Dilution Statute are unavailable to competitors. *Door Systems*, 905 F. Supp. at 498. In this case, the parties are clearly competitors[16] and, therefore,

---

[14] A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:
  1) passes off goods or services as those of another;
  2) causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services;
  3) causes likelihood of confusion or misunderstanding as to affiliation, connection or association with or certification by another …

815 ILL. COMP. STAT. 510/2 (2001).

[15] The Complaint cites to 765 ILL. COMP. STAT. 1035/15 but that Illinois statute was repealed by P.A. 90-231, § 905 effective January 1, 1998. The correct citation for the Illinois Anti-Dilution Act is 765 ILL. COMP. STAT. 1036/15.
[16] In the analysis of the likelihood of confusion under the trademark infringement analysis, the Court did not make a determination as to whether or not the Jake's in Rolling Meadows competed with Defendants' restaurant for customers in the same geographic area. From the tenor of the pleadings, however, it is clear that the parties view one another as competitors in the broader fast food marketplace.

Jake's is not entitled to relief under this statute. Therefore, the Court enters judgment in favor of Defendants on Count V.

Counts VI and VII of the Complaint respectively allege unjust enrichment and violation of the non-compete clause of the 1976 License Agreement. Because Defendants' two remaining Counterclaims, which allege a breach of contract and a violation of the Illinois Franchise Disclosure Act, bear upon the resolution of Plaintiff's Counts VI and VII, the Court will address Defendants' remaining Counterclaims first, and then return to Counts VI and VII of Jake's' Complaint.

## VI. Defendants' Counterclaim Count I, Breach of Contract

The elements of a breach of contract claim are: (1) existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resultant injury to the plaintiff. *Higher Gear Group, Inc. v. Rockenbach Chevrolet Sales, Inc.*, 223 F. Supp.2d 953, 957-58 (N.D. Ill. 2002). The party asserting such a claim must also establish damages with reasonable certainty. *R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 924 F.2d 709, 712 (7th Cir. 1991). Neither party disputes that Jake's International and the Kaisers duly executed the 1976 License Agreement. Neither party disputes that the 1976 License Agreement passed to Jake's as successor in bankruptcy in November 1997. And both parties agree that the 1976 License Agreement defined and governed their relationship as franchisor and franchisee.

The issue then becomes whether Jake's breached the 1976 License Agreement by forcing Defendants to choose between signing the New Agreement or losing their franchise. Jake's claims that, because the 1976 License Agreement and the New Agreement were substantially similar, it did not breach the parties' 1976 contract when it presented the New Agreement to Defendants. Defendants counter that the two Agreements are materially different, and that Jake's, therefore, breached the 1976 License Agreement.

The Court can readily compare the two contracts, side by side, and determine that they are materially different. The December 5, 2000 letter mailed by Jake's counsel, demanding that Defendants cease infringement and disassociate from Jake's, clearly states that the reason for Jake's action was Defendants' refusal to sign the New Agreement. The record contains no evidence that Defendants breached the 1976 License Agreement prior to Jake's taking this action. Defendants had been a Jake's franchisee from December 8, 1976 until receipt of this letter in December 2000, which, Jake's admits, terminated the 1976 License Agreement.

The 1976 License Agreement consists of 15 typed pages, double-spaced. The New Agreement incorporates a table of contents and contains 46 single-spaced, typed pages, including the Guaranty attachment and Addendum, which modified the

franchise fee from 5% to 3% of gross sales to match the 1976 License Agreement.

### 1. New Agreement vs. 1976 License Agreement[17]

The Court need not cover all the differences between the two contracts, but will highlight a few of the terms in order to show the material differences. In Section 8.B, the New Agreement sets the ongoing franchise fee at 5% of gross sales, although the addendum modifies this to 3% to match the 1976 License Agreement. Certainly, a franchisee's interest is piqued in reading the rest of the contract when the franchisor raises the monthly fee 66.6%, from 3% to 5% of gross sales.

Section 8.C of the New Agreement allows Jake's to implement an advertising fund, at its sole discretion, of up to 2% of gross sales. Section 10.B allows Jake's, at its discretion, to require up to an additional 2% for local advertising. The 1976 License Agreement has no such provision. Jake's maintains that he orally informed Defendants that he was not going to enforce the advertising clause. However, because the New Agreement, at Section 16.H, purports to be the entire agreement and can only be modified by the written agreement of the parties, Jake's oral assurances are in conflict with these written terms.

---

[17] See Exhibit C of the Complaint for the 1976 License Agreement and Exhibit H of the appendix to Plaintiff's Motion for Summary Judgment for the New Agreement, including the addendum modifying the franchise fee.

Section 3 of the New Agreement requires Jake's approval of any lease or sublease. Although Jake's maintains that Defendants own the building and that, therefore, this section has no effect, (Pl.'s 56.1 Resp. ¶ 15.), it would have effect if Defendants wanted to sell the building in the future and lease it back -- not an uncommon occurrence in the business world. The 1976 License Agreement had no such restriction.

The New Agreement also: (1) imposes more restrictive renewal procedures (Sec. 2.D); (2) imposes training (Sec. 4); (3) levies a service charge on late payments of 1.5%/month (Sec. 8.E); (4) allows Jake's to dictate replacement equipment or expenditures related to general state of repair (Section 9.B); (5) allows Jake's to control the hours of operation (Sec. 9.E); (6) requires CPA review of financial documents (Sec. 11.B); and (7) waives Defendants' rights to punitive damages claims and trial by jury in actions against Jake's (Jake's, however, would maintain its right to a jury trial and punitive damages against the franchisee for specified claims it may have against Defendants). (Sec. 16.K).

From this overview of the two agreements, the Court concludes that the 1976 License Agreement was substantially less restrictive than the New Agreement. Jake's' claim that the terms of the New Agreement are not materially different from the 1976 License Agreement lacks support in the record.

Having determined that the agreements are materially different, the Court must determine whether Jake's breached the 1976 License Agreement by demanding that Defendants sign the New Agreement. The parties were operating under the 1976 License Agreement until it was terminated by the December 5, 2000 letter signed by Jake's counsel. The letter plainly declares that the reason for the "Demand To Cease Infringement And Disassociate," was because Defendants would not sign the New Agreement. There are no reasonable allegations in the record that Defendants failed to comply with the 1976 License Agreement prior to receipt of this letter. Mr. Flowers ultimately acknowledged that the 1976 License Agreement did not empower Jake's to compel Defendants to sign a New Agreement. Therefore, in sending this letter, Jake's breached the 1976 License Agreement, because the demand and termination were not in accord with any provisions in the 1976 License Agreement.

## 2. Damages for Breach of Contract

Defendants provided sales and income data from the operation of their business, as shown below (Defs.' 56.1 Opp. ¶ 45, Ex. F ¶8.):

| Year | Sales | Income |
|------|-------|--------|
| 1998 | $416,475.54 | $7,980.00 |
| 1999 | $409,242.07 | $4,112.00 |
| 2000 | $392,424.62 | $3,866.00 |
| 2001 | $340,409.89 | ($16,596.00) |

Damages must be proved with reasonable certainty. *R.E. Davis Chem.*, 924 F.2d at 712. Jake's contends that Defendants have not supported their damage claim and that Ms. Kaiser could not testify to any degree of certainty that a $70,000 sales decline was attributable to Jake's conduct. Jake's claims that Ms. Kaiser did not know how much of the business loss was from product changes and how much was from business changes. In her deposition testimony, Ms. Kaiser conceded that blaming Mr. Flowers for the $70,000 would be "ridiculous" and she further stated that it was "part of doing business when you're kicked out of a franchise after 30 years." She also stated that some of the loss could have been attributable to a general decline in restaurant sales after September 11, 2001.

The Court finds that Defendants have not proven damages to a reasonable certainty. Although the Kaiser's business suffered a 13.3% decline in sales from 2000 to 2001, the Court concludes that Defendants have not shown with reasonable certainty that the decline was the result of Jake's contract breach. Such damages, if any, must be proven at trial.

**VII. Defendants' Counterclaim Count II, Violation of the 1987 Illinois Franchise Disclosure Act**

Defendants argue that the 1976 License Agreement renewed every five years according to its terms. Thus, Defendants claim that the 1976 License Agreement renewed after the Franchise Disclosure Act was passed by the Illinois legislature and is applicable. The Act states in part:

32

Sec. 19.  Termination of a Franchise.  (a) It shall be a violation of this Act for a franchisor to terminate a franchise of a franchised business located in this State prior to the expiration of its term except for  "good cause" as provided in subsection (b) or (c) of this Section.
(b)  "Good cause" shall include, but not be limited to, the failure of the franchisee to comply with any lawful provisions of the franchise or other agreement and to cure such default after being given notice thereof and a reasonable opportunity to cure such default, which in no event need be more than 30 days.

815 Ill. Comp. Stat. 705/19 (1999)

Sec. 26. Private civil actions. Any person who offers, sells, terminates, or fails to renew a franchise in violation of this Act shall be liable to the franchisee who may sue for damages caused thereby. This amendatory Act of 1992 is intended to clarify the existence of a private right of action under existing law with respect to the termination or nonrenewal of a franchise in violation of this Act.  In the case of a violation of Section 5, 6, 10, 11, or 15 of the Act, the franchisee may also sue for rescission.

815 Ill. Comp. Stat. 705/26 (1999)

A general presumption in Illinois law is that legislation is prospective in nature unless there is an express provision in the statute that the legislation is intended to have a retroactive effect. *Mech. Rubber & Supply Co. v. Am. Saw and Mfg. Co.*, 810 F. Supp. 986, 991 (C.D. Ill. Nov. 14, 1990).  Illinois courts have uniformly refused to apply Franchise Acts retroactively. *Id.* at 992.  To support their position, Defendants cite to *To-Am Equip. Co., Inc. v. Mitsubishi Caterpillar Forklift*, 913 F. Supp. 1148, 1152 n.6 (N.D. Ill. 1995), for the proposition that "renewal of a franchise agreement constitutes the making of a new contract, and that new contract would be governed by the statute

in effect at that time." However, "Illinois law instructs that, absent clear language to the contrary, statutes apply prospectively only." *Id.* The court held that prior law governed and applied the earlier statute - not the latter.[18] *Id.* The *To-Am* court noted that the contract between the parties "appears to eschew annual renewals in favor of a continuing contract." *Id.*

Defendants also cite to *Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 50 (7th Cir. 1980) for the proposition that contract renewal may take place, based upon the year to year conduct of the parties, bringing their contract under the authority of a more recent statute. This case, however, was decided under Wisconsin law, refers to the intent of the Wisconsin legislature, pre-dates the Act in question in this case, and discusses contracts that were signed by both parties on an annual basis. *See id.* at 49-50.

The Court concludes that the 1976 License Agreement was a continuing agreement, not one that was seriously reviewed on an annual or five-year basis, and re-signed by the parties. It was an effective contract, but not subject to the 1987 Illinois Franchise Disclosure Act. Therefore, the Court grants summary judgment in favor of Jake's on Counterclaim Count II. The Court now returns to the final two Courts of Jake's' Complaint.

---

[18] "Consistent with this presumption of prospectivity, the Act of 1987 expressly provides that "[p]rior law exclusively governs all suits, actions, prosecutions, or proceedings which are pending or may be initiated *on the basis of facts occurring before the effective date of this Act* [January 1, 1988]." 815 Ill. Comp. Stat. 705/28 (emphasis added)." *To-Am,* 913 F. Supp. at 1152 n.6.

## VIII. Unjust Enrichment

An unjust enrichment claim presents mixed questions of law and fact. *See In re Teranis*, 128 F.3d 469, 471 (7th Cir. 1997). To withstand summary judgment on an unjust enrichment charge, a plaintiff must create a genuine issue as to whether: (1) the defendants have unjustly retained a benefit to the plaintiff's detriment; and (2) the defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience. *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). In Illinois, unjust enrichment is based on an implied contract in law. *Brown v. Sears Roebuck & Co.*, No. 02-C-3939, slip copy, 2002 WL 31433395 at *2 (N.D. Ill. Oct. 29, 2002).

Because the Court has determined that Jake's breached the 1976 License Agreement, as of December 2000, there was no express contract between the parties. Therefore, unjust enrichment, which is based on an implied contract in law, is a valid cause of action for Jake's. However, Jake's must first create a genuine issue as to whether Defendants have unjustly retained a benefit to Jake's detriment, and whether such retention violates fundamental principles of justice, equity and good conscience. *HPI Health Care*, 545 N.E.2d at 679. Jake's claim of unjust enrichment is based on Defendants' unauthorized use of Jake's trademarks. Because a genuine issue of material fact exists as to whether Defendants have infringed Jake's trademarks, Jake's has

not shown that Defendants benefitted to Jake's detriment. Therefore, the Court denies both parties' Motions for Summary Judgment on Count VI.

## IX. Violation of the Non-Compete Provision of the 1976 Agreement

It is well established in contract law that a party, who substantially breaches a contract with another party, cannot then hold the other party to the terms of the contract. *Maksym v. Loesch*, 937 F.2d 1237, 1245 (7th. Cir. 1991). As the Court previously found, Jake's breached the 1976 License Agreement via the December 5, 2000 letter demanding disassociation. Therefore, Jake's is estopped from enforcing the non-compete provisions of that contract against Defendants. Thus, Count VII is moot and the Court grants summary judgment in favor of Defendants on Count VII of the Complaint.

### CONCLUSION

The Court has evaluated independently both parties' Motions for Summary Judgment, which encompassed Counts I-VII of the Complaint, and Counts I and II of Defendants' Counter-Complaint. The Court grants summary judgment in favor of Defendants on Count V (Illinois Anti-Dilution Act claim), and Count VII (Violation of the 1976 Agreement's Non-Compete Provision claim) of the Complaint. The Court also grants summary judgment in favor of Defendants on Count I (Breach of Contract claim) of the Counter-Complaint, but only with respect to liability, not damages. Finally, the Court grants summary judgment in favor of Plaintiff

on Count II (Violation of the 1987 Ill. Franchise Disclosure Act claim) of the Counter-Complaint.

The case will proceed to trial with respect to Counts I, II, III, IV, and VI of the Complaint, and with respect to the breach of contract damages that Defendants incurred, pursuant to Count I of the Counter-Complaint.

### ORDER

For the aforementioned reasons, **IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary Judgment be, and the same hereby is, **GRANTED** on Defendants' Counter-Complaint Count II, and **DENIED** on Plaintiff's Counts I through VII and Defendants' Counter-Complaint Count I. **IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment be, and the same hereby is, **GRANTED** on Counts V and VII of the Complaint and Count I of the Counter-Complaint, and **DENIED** on Counts I, II, III, IV, and VI of the Complaint, and Count II of the Counter-Complaint.

DATED: December 30, 2002    E N T E R:

ARLANDER KEYS
United States Magistrate Judge

37